IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Timothy Godfrey, | ) | C/A No.: 1:15-2036-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying his claims for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). The two issues before the court are whether the
Commissioner's findings of fact are supported by substantial evidence and whether she
applied the proper legal standards. For the reasons that follow, the undersigned
recommends that the Commissioner's decision be reversed and remanded for further
proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On August 29, 2012, Plaintiff protectively filed applications for DIB and SSI in
which he alleged his disability began on June 29, 2009. Tr. at 83, 96, 191–92. His

applications were denied initially and upon reconsideration. Tr. at 144–48, 154–55, 156–57. On June 26, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Jerry W. Peace. Tr. at 27–82 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 31, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 6–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 15, 2015. [ECF No. 1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 53 years old at the time of the hearing. Tr. at 38. He completed high school. *Id.* His past relevant work ("PRW") was as a construction worker. Tr. at 76. He alleges he has been unable to work since June 1, 2011.[1] Tr. at 31–32.

        2.    Medical History

Plaintiff presented to the emergency room ("ER") at Spartanburg Regional Healthcare System on November 7, 2011, with complaints of back pain and nausea. Tr. at 357. Plaintiff's glucose was significantly elevated at 312 mg/dL. Tr. at 363. He was diagnosed with back pain and diabetes, prescribed Glucophage and Lortab, and instructed to follow a diabetic diet and to follow up with a clinic. Tr. at 359.

---

[1] At the beginning of the hearing, Plaintiff's attorney moved to amend his alleged disability onset date from June 29, 2009, to June 1, 2011, because he drew unemployment benefits through May 2011. Tr. at 31.

On April 24, 2012, Plaintiff presented to St. Luke's Free Medical Clinic ("SLFMC") to establish primary care treatment. Tr. at 265, 270. He reported occasional right flank pain and requested that his prescription for Metformin be refilled. Tr. at 265. Blood tests indicated Plaintiff's hemoglobin A1c was elevated at 9.0 percent and his average glucose was estimated to be 212 mg/dL. Tr. at 267.

On May 16, 2012, Plaintiff presented to Palmetto Eye and Laser Center for an examination. Tr. at 266. Leanne Wickliffe Keisler, M.D. ("Dr. Keisler"), indicated Plaintiff's eye exam showed his bilateral vision to be unaffected by diabetes, but indicated he had cataracts and nuclear sclerosis in his bilateral eyes. *Id.* Dr. Keisler prescribed new glasses. *Id.*

Plaintiff followed up at SLFMC on May 22, 2012, and indicated Lisinopril was causing him to feel dizzy. Tr. at 264. The provider assessed uncontrolled blood pressure and uncontrolled diabetes mellitus. *Id.* He increased Plaintiff's dosage of Metformin for diabetes and discontinued Lisinopril and prescribed Diovan for hypertension. *Id.* Plaintiff's blood sugar was 199 mg/dL and he reported intermittent right-sided pain and tingling in his feet during the night. *Id.* Plaintiff indicated he was very depressed and did not desire to be around others. *Id.* The provider observed Plaintiff to have tenderness in his back, decreased pedal pulses, and decreased monofilament testing in his bilateral toes. *Id.* The provider assessed uncontrolled diabetes with neuropathy, hypertension, and situational depression. *Id.*

Plaintiff presented to SLFMC on June 19, 2012, and reported pain, numbness, and tingling in his right arm, pain in his legs and feet, and elevated blood pressure. Tr. at 263.

3

He stated Diovan had caused him to experience a "fainting" feeling. *Id.* He reported decreased interest in activities and increased stressors as a result of being unemployed and requested medication to treat depression. *Id.* The provider prescribed Metaprolol for hypertension and Citalopram (generic form of Celexa) for depression. *Id.*

On June 20, 2012, an x-ray of Plaintiff's cervical spine indicated mild multilevel degenerative changes that were most prominent at C6-7. Tr. at 269.

Plaintiff followed up at SLFMC on July 12, 2012, and reported a rash. Tr. at 262. The provider indicated the rash was likely a reaction to either Celexa or Metaprolol. *Id.* He recommended Plaintiff discontinue Celexa to see if his symptoms improved. *Id.* He indicated that Plaintiff should discontinue Metaprolol and resume Celexa if the rash remained five or six days after he discontinued Celexa. *Id.*

On August 6, 2012, Plaintiff presented to SLFMC for a follow-up visit regarding diabetes and hypertension and to review his x-ray. Tr. at 261. Plaintiff reported continued numbness and tingling in his left arm. *Id.* Plaintiff also complained of pain and numbness in his right hand that radiated from his shoulder. *Id.* The physician noted that Plaintiff endorsed tingling in his feet and diagnosed diabetic neuropathy. *Id.* He stated degenerative changes were present on a computed tomography ("CT") scan and that Plaintiff may have nerve compression. *Id.* The provider increased Plaintiff's dosage of Metaprolol for depression and indicated Plaintiff's depression was stable without Celexa. *Id.*

On August 21, 2012, magnetic resonance imaging ("MRI") of Plaintiff's cervical spine showed a disc herniation on the right at C6-7 that appeared to press on the exiting nerve root. Tr. at 321.

Plaintiff presented to Pamela N. Davenport, M.D. ("Dr. Davenport"), for an initial office visit on October 8, 2012. Tr. at 334. Dr. Davenport noted that Plaintiff had limited access to insurance coverage in recent years and was unable to afford test strips for checking his blood sugar. *Id.* She stated Plaintiff had two recent syncopal episodes. *Id.* Plaintiff complained of paresthesias down his right arm that affected his thumb, index, and middle fingers. *Id.* He reported fatigue and daytime sleepiness. *Id.* He stated he had nausea and diminished appetite and had unintentionally lost 60 pounds. *Id.* He complained of tingling in his feet at night, cramps in his feet, and lower extremity pain associated with walking. *Id.* Dr. Davenport described Plaintiff as "appearing chronically-ill." Tr. at 337. She observed diminished pedal pulses in Plaintiff's bilateral feet. *Id.* A diabetic foot exam revealed a callus on the tip of Plaintiff's right second toe without ulceration, as well as diminished pulses and sensation. *Id.* Plaintiff had decreased sensation to vibratory sense in his hands and feet. *Id.* His sharp sensation was diminished in his right hand in the radial and ulnar distributions and in his left hand in the ulnar distribution. *Id.* He had diminished reflexes throughout. *Id.* Dr. Davenport indicated Plaintiff may have a neurologic component to his syncopal episodes and should be evaluated for carotid artery stenosis. Tr. at 338. She stated Plaintiff had diabetes mellitus with evidence of vascular and neurologic complications and indicated his poorly-controlled diabetes had resulted in peripheral neuropathy. *Id.* She also noted Plaintiff

likely had some component of peripheral arterial disease. *Id.* However, a carotid procedure on October 12, 2012, showed no evidence of hemodynamically-significant carotid stenosis. Tr. at 341–43. On October 31, 2012, Plaintiff followed up with Dr. Davenport, who noted that the carotid artery studies were within normal limits and that Plaintiff had experienced no additional syncopal episodes. Tr. at 348. Dr. Davenport reviewed Plaintiff's blood sugar logs and noted that there was room for improvement, but acknowledged that Plaintiff continued to complain of nausea and weight loss. *Id.* Dr. Davenport indicated she suspected Plaintiff had autonomic neuropathy in additional to diabetes-related peripheral neuropathy. *Id.* She also suspected possible gastroparesis and recommended Plaintiff undergo upper gastrointestinal endoscopy. *Id.*

Plaintiff presented to Gordon Early, M.D. ("Dr. Early"), for a consultative examination on December 13, 2012. Tr. at 272–74. Plaintiff indicated he was primarily applying for disability benefits because of right shoulder pain. Tr. at 272. He reported that he had developed numbness and tingling two to three years earlier and had lost approximately 70 pounds over the last year. *Id.* Dr. Early indicated he suspected Plaintiff had developed diabetes approximately five years earlier, around the time of the onset of nocturia, and that it had gone untreated until one year earlier. *Id.* Plaintiff indicated that he had difficulty with his balance and limited standing tolerance because of numbness and tingling in his feet. *Id.* He stated he was very depressed. Tr. at 273. Dr. Early observed Plaintiff to be 5' 5" tall and to weigh 174 pounds. *Id.* Plaintiff's blood pressure was elevated at 182/96. *Id.* He had good range of motion ("ROM") in his upper extremities, but some osteoarthritic changes in the distal joints of his hands. *Id.* His right

shoulder abduction was reduced and he had one positive impingement finding. *Id.* Plaintiff had 2+ crepitus in his bilateral knees. *Id.* His pulses were intact in his feet. *Id.* He had positive Romberg's test and 1+ positive tandem gait. Tr. at 273–74. Dr. Early indicated Plaintiff had right shoulder impingement, but that the exam was not particularly impressive. Tr. at 274. He stated that Plaintiff's shoulder impingement would prevent him from working with his hands over shoulder level as a carpenter. *Id.* He assessed diabetes with peripheral neuropathy and ataxia and indicated Plaintiff "may have an element of autonomic neuropathy with gastropathy and orthostatic syncope." *Id.* He stated Plaintiff had significant depression that may be contributing to his weight loss. *Id.* An x-ray of Plaintiff's lumbosacral spine was normal. Tr. at 277.

On January 10, 2013, state agency medical consultant Dale Van Slooten, M.D., assessed the following limitations as part of a physical residual functional capacity ("RFC") assessment: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs, stoop, kneel, and crawl; occasionally climb ladders/ropes/scaffolds and balance; frequently reach overhead with the right upper extremity; and avoid concentrated exposure to hazards. Tr. at 89–91.

Plaintiff presented to Caleb Loring, IV, Psy. D. ("Dr. Loring"), for a mental status examination on January 24, 2013. Tr. at 278–80. He indicated to Dr. Loring that he was depressed because of his inability to find a job. Tr. at 278. He also indicated he had diabetes, high blood pressure, nerve damage in his feet, and degenerative disc disease. *Id.*

He stated that pain in his feet prevented him from standing for long periods. *Id.* He indicated that he took Prozac for depression, which did not seem to relieve his symptoms. Tr. at 279. He stated he had taken Effexor in the past and that it was more effective, but was not covered by his current insurance. *Id.* Dr. Loring observed that Plaintiff maintained appropriate eye contact and was pleasant and cooperative. *Id.* He stated Plaintiff was "perhaps moderately depressed." *Id.* He indicated Plaintiff had normal speech, thought process, and thought content. *Id.* He stated Plaintiff did not have problems with concentration and was alert and oriented. *Id.* He estimated Plaintiff's intellectual functioning to be in the low-average range. *Id.* He stated Plaintiff's "physical problems appear to be the primary issues." Tr. at 280. He assessed anxiety disorder, not otherwise specified ("NOS") and mood disorder due to a general medical condition with major depressive features. *Id.*

On January 24, 2013, Plaintiff followed up with Dr. Davenport at the request of his family members who were concerned that he was not taking care of himself. Tr. at 312. Plaintiff indicated his blood sugars were running high and that his eating patterns were erratic. *Id.* A review of symptoms revealed numbness and pain in Plaintiff's feet and poor balance. *Id.* Dr. Davenport assessed diabetes mellitus with neurologic complications and poor motivation for self-care; peripheral neuropathy with increased pain; depression, probably interfering with quality of life; subsided nausea; and hypertension with a labile component. *Id.* She reviewed Plaintiff's blood sugar log and adjusted his dosages of Metformin, Neurontin, and Prozac. *Id.* She recommended Plaintiff obtain counseling through the mental health center. *Id.*

On February 5, 2013, Dr. Davenport indicated that Plaintiff had been unable to increase his dosage of Neurontin because his drug plan and pharmacy could not accommodate the new dose at the same price as his previous dose. Tr. at 282. She noted that Plaintiff felt fatigued and depressed. *Id.* She indicated she had recommended Plaintiff pursue counseling at the mental health center, but Plaintiff had failed to follow through. *Id.* Dr. Davenport indicated Plaintiff's blood pressure showed no orthostatic drop during the examination. *Id.* She stated Plaintiff's fatigue, depression, and erectile dysfunction were possibly aggravated by his use of a beta blocker. *Id.* Dr. Davenport noted that Plaintiff had multiple neurologic complications from diabetes, including peripheral neuropathy and suboptimal control of pain. *Id.*

State agency consultant Samuel Goots, Ph. D. ("Dr. Goots"), completed a psychiatric review technique form ("PRTF") on February 8, 2013, and considered Listings 12.04 for affective disorders and 12.06 for anxiety related disorders. Tr. at 87–88. He assessed Plaintiff as having mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 87. He indicated Plaintiff was limited to unskilled work. Tr. at 88. Dr. Goots also completed a mental RFC assessment and assessed Plaintiff as moderately limited in his abilities to understand, remember, and carry out detailed instructions. Tr. at 91–93.

On February 27, 2013, Plaintiff presented to Dr. Davenport's office for a blood pressure check. Tr. at 303. He complained of depression and lower back pain. *Id.* He indicated antidepressant medication had not improved his depression and Gabapentin

9

caused him to feel terrible and provided no relief. *Id.* Amanda Brown, NP ("Ms. Brown"), observed bilateral lower lumbar tenderness to palpation and depressed affect, but noted no other abnormalities. Tr. at 306. She prescribed an increased dose of Lisinopril and instructed Plaintiff to decrease his sodium intake and to monitor his blood pressure. Tr. at 307. Ms. Brown indicated Plaintiff should do no heavy lifting, bending, or stooping. *Id.*

On March 14, 2013, Plaintiff followed up with Ms. Brown. Tr. at 295–99. He shared a blood pressure log that showed his blood pressure to vary from 93/70 to 176/77 mg/dL. Tr. at 295. He reported several episodes of dizziness when Lisinopril was increased, but noted that the dizziness had stopped. *Id.* Ms. Brown observed no abnormalities on examination. Tr. at 297–98.

On March 19, 2013, state agency consultant Xanthia Harkness, Ph. D. ("Dr. Harkness"), reviewed the evidence and completed a PRTF. Tr. at 116–17. She considered Listings 12.04 and 12.06 and concluded that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintain concentration, persistence, or pace. *Id.* Dr. Harkness indicated in a mental RFC assessment that Plaintiff had moderately limited abilities to understand, remember, and carry out detailed instructions. Tr. at 121–23.

State agency medical consultant Seham El-Ibiary, M.D. ("Dr. El-Ibiary"), assessed Plaintiff's physical RFC on March 19, 2013, and indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours

in an eight-hour workday; frequently push/pull with the bilateral lower extremities, reach overhead with the right arm, climb ramps/stairs, stoop, kneel, crouch, and crawl; occasionally climb ladders/ropes/scaffolds and balance; and avoid concentrated exposure to hazards. Tr. at 118–21.

On June 6, 2013, Dr. Davenport indicated Plaintiff's blood sugar log showed him to have good control. Tr. at 401. Plaintiff complained of positional paresthesias in his hands that were consistent with carpal tunnel syndrome and dysesthesias in his feet that were consistent with peripheral neuropathy. *Id.* Plaintiff indicated he was unable to work outside because of dizziness and lightheadedness; could not use his hands to paint because of carpal tunnel syndrome; and could not clip his own toenails safely because of peripheral neuropathy. *Id.* Plaintiff's blood pressure was elevated. *Id.* A diabetic foot exam showed diminished pedal pulses bilaterally; decreased sensation; and slight trauma to the cuticle of the left great toe. *Id.* Dr. Davenport recommended Plaintiff use wrist splints on his bilateral hands and apply antibiotic ointment to the injured cuticle and a lesion on his skin. *Id.* She authorized Plaintiff to receive a disabled parking placard and indicated on the form that he had "a substantial limitation in the ability to walk due to an arthritic, neurological, or orthopedic condition" that was permanent. Tr. at 405, 410.

Plaintiff followed up with Ms. Brown on June 27, 2013. Tr. at 397. He reported occasional lightheadedness on the increased dose of Lisinopril. *Id.* He indicated his blood pressure ranged from 86/60 to 154/106 and his blood sugar ranged from 90 to 177 mg/dL. *Id.* Ms. Brown observed no abnormalities on physical exam. Tr. at 398–99.

On July 18, 2013, Plaintiff followed up with Ms. Brown. Tr. at 392. He denied dizziness, but complained of more stress and poor sleep. *Id.* Ms. Brown observed no abnormalities on examination. Tr. at 394. She refilled Plaintiff's medications and instructed him to continue to monitor his blood pressure. Tr. at 394–95.

Plaintiff presented to Dr. Davenport with multiple complaints on September 24, 2013. Tr. at 383. He reported leg pain, foot pain, leg cramps, back pain, stiffness, depression, and inability to obtain medical assistance. *Id.* He complained of excessive sedation while taking a high dose of Gabapentin, but indicated he was unable to sleep at night because of worry. *Id.* Dr. Davenport indicated Plaintiff's blood sugars ranged from 119 to 187 mg/dL, but Plaintiff reported no hypoglycemia or recent fainting spells. *Id.* Dr. Davenport noted that Plaintiff cried intermittently and was unable to maintain eye contact during the examination. *Id.* A diabetic foot exam revealed diminished pulse in Plaintiff's bilateral feet, a callus on the tip of the right second toe, and peripheral neuropathy. *Id.* Dr. Davenport indicated she offered to adjust Plaintiff's dosage of Gabapentin, but he did not want for her to do so. *Id.* She offered to adjust the Prozac, but Plaintiff was afraid his pharmacy would charge too much. *Id.* She recommended Plaintiff visit the mental health clinic, but he stated that the mental health clinic told him he would need to go to the ER. *Id.* Plaintiff also declined a referral to physical therapy because he said he did not have transportation. *Id.*

Plaintiff underwent a vascular lower extremities arterial duplex and lower arterial plethysmography procedure on October 3, 2013. Tr. at 353–55. The study revealed bilateral lower extremity atherosclerotic disease and mild flow reduction in the bilateral

12

lower extremities. Tr. at 353. Dr. Davenport's note from the next day indicated that Plaintiff's peripheral arterial disease should not cause pain at rest and that Plaintiff should walk "as best he can to promote improved circulation in nearby arteries" and should treat the pain from neuropathy with Gabapentin. Tr. at 388.

On January 7, 2014, Plaintiff complained to Dr. Davenport of foot pain related to neuropathy and vascular disease. Tr. at 377. He stated his pain occurred mostly at night, but indicated his balance was compromised and that he staggered at times. *Id.* Dr. Davenport encouraged Plaintiff to take 2000 units of Vitamin D daily and prescribed an increased dose of Pravastatin. Tr. at 382.

Plaintiff presented to Dr. Davenport on March 10, 2014, complaining of a sore on his left great toe that had appeared two weeks earlier and recently worsened. Tr. at 452. He reported throbbing pain in his left great toe. *Id.* He indicated he had experienced a loss of consciousness a couple of months earlier when he ran into a wall while playing with a child, but denied syncopal episodes. *Id.* Dr. Davenport noted that the diabetic foot exam showed two hemorrhagic round lesions just distal to the medial corner of the toenail bed on the tip of the left great toe. Tr. at 455. She indicated the lesions measured four-tenths and eight-tenths of a centimeter. *Id.* She noted the wounds were red and tender to palpation. *Id.* Dr. Davenport indicated Plaintiff's left great toe was hemorrhagic with vesicles and cellulitis emerging. *Id.* She prescribed Keflex for cellulitis and referred Plaintiff to the wound center. Tr. at 457.

Plaintiff presented to Howard Klickman, M.D. ("Dr. Klickman"), at Spartanburg Regional Wound Healing Services on March 12, 2014. Tr. at 422. Plaintiff indicated his

left great toe had developed redness and that the pain had worsened. *Id.* He reported no improvements since starting the Keflex prescription. *Id.* Plaintiff indicated he experienced claudication in his bilateral calves while walking. *Id.* Dr. Klickman noted that Plaintiff's dorsalis pedis and posterior tibial pulses were somewhat diminished bilaterally. Tr. at 424. He observed a black necrotic area on the tip of the medial corner of the nail of Plaintiff's left great toe that measured about six-tenths of a centimeter in diameter. *Id.* He described the skin and soft tissues on the tip as red, slightly swollen, and exquisitely tender. *Id.* Plaintiff had diminished sensor-monofilament in her bilateral feet. Tr. at 425. Dr. Klickman prescribed Keflex and Bactrim for treatment of cellulitis. *Id.* He recommended transcutaneous oxygen measurements and referral to a vascular surgeon. *Id.* He noted that Plaintiff was at moderately-high risk for more proximal limb loss. *Id.*

On March 19, 2014, Plaintiff continued to complain to Dr. Klickman of throbbing pain in his left great toe and the dorsum of his foot. Tr. at 417. Transcutaneous oxygen measurements showed normal oxygen tension, but poor response to the oxygen challenge in the left calf. Tr. at 418. The 10-minute equilibration readings at the left lateral calf and the left dorsal foot indicated severe hypoxemia with no response to the oxygen challenge. Tr. at 418–19. Dr. Klickman indicated further arterial evaluation was warranted and was being pursued. Tr. at 419. He prescribed Norco for pain and Clindamycin for cellulitis. Tr. at 420.

Plaintiff also visited Cuyler Calton, M.D. ("Dr. Calton"), on March 19, 2014. Tr. at 428. He indicated he experienced bilateral claudication symptoms when he walked 100 yards. *Id.* He stated his pain resolved after he rested for 10 to 15 minutes. *Id.* Plaintiff

endorsed numbness in his feet and occasional balance problems as a result of neuropathy. *Id.* Dr. Calton observed Plaintiff to have a small ulcer on his left great toe with black eschar that measured two to three millimeters. Tr. at 431. He indicated Plaintiff's sensation was intact and his gait was steady. *Id.* A vascular exam indicated pulses were barely palpable in the bilateral popliteal veins. *Id.* Dr. Calton assessed a diabetic ulcer of the left great toe and peripheral vascular disease. *Id.*

Plaintiff returned to Dr. Klickman on March 26, 2014. Tr. at 414. He reported the throbbing in his toe had improved significantly with the addition of Clindamycin. *Id.* Dr. Klickman noted that the cellulitis had improved and that Plaintiff no longer needed antibiotics. Tr. at 415. He indicated Plaintiff should continue to paint his toe with Betadine daily, use a post-operative shoe for offloading, continue taking pain medication, and return in one week after undergoing angiogram. *Id.*

On March 27, 2014, Plaintiff underwent limited distal aortogram and pelvic arteriogram, left lower extremity arteriogram, left superficial femoral artery ("SFA") balloon angioplasty, left mid-popliteal artery balloon angioplasty, left peroneal artery balloon angioplasty, and ultrasound-guided puncture to confirm patency of the right femoral artery. Tr. at 544. Dr. Calton recommended Plaintiff be maintained on Plavix indefinitely due to small vessel disease and tenuous angioplasty. Tr. at 546. He also recommended Plaintiff continue taking aspirin and a statin. *Id.* He instructed Plaintiff to follow up with Dr. Klickman regarding his toe ulcer. *Id.*

Plaintiff followed up with Dr. Klickman on April 2, 2014. Tr. at 411. He continued to report a dull pain in his left great toe that he rated as a six to seven of ten. *Id.*

Dr. Klickman noted that the ulcer on Plaintiff's toe was ischemic and that Plaintiff was at high risk for limb loss. Tr. at 412. He refilled Plaintiff's prescription for Norco for pain, painted Plaintiff's toe with Betadine, and instructed Plaintiff to continue painting his toe with Betadine on a daily basis, to use a post-operative shoe, and to follow up in two weeks. *Id.*

Plaintiff followed up with Dr. Calton on April 16, 2014. Tr. at 532. Dr. Calton noted that the ulcer on Plaintiff's toe was healing and felt much better. *Id.* Plaintiff denied left leg claudication. *Id.* Dr. Calton indicated Plaintiff was doing well following multivessel angioplasty. Tr. at 535. He recommended Plaintiff undergo baseline arterial duplex scan. *Id.*

Plaintiff also presented to Dr. Klickman on April 16, 2014, for reevaluation of his left great toe ulcer. Tr. at 550. He denied pain in the toe. *Id.* Dr. Klickman noted that the ulcer was noticeably smaller than it was during the last visit. Tr. at 551.

On April 21, 2014, Dr. Davenport indicated she had instructed Plaintiff to discontinue Lisinopril over the previous weekend because lab work revealed his potassium to be too high. Tr. at 434. Plaintiff presented with elevated blood pressure. *Id.* Dr. Davenport prescribed Amlodipine and instructed Plaintiff to remain off Lisinopril and to stop drinking mineral water. Tr. at 437. She indicated the lab work showed Plaintiff's diabetes to be reasonably controlled. Tr. at 438.

Plaintiff underwent arterial duplex examination of his bilateral lower extremities on April 22, 2014. Tr. at 528–31. Testing revealed the following results in Plaintiff's right lower extremity: right SFA stenosis; precluded ankle brachial index ("ABI"); wave

forms compatible with runoff disease; critically depressed right toe brachial index ("TBI"); and no detectable measurable pressure in the dorsalis pedis artery ("DPA"). Tr. at 529. Plaintiff's left lower extremity results were as follows: precluded ABI; patent SFA, popliteal, and peroneal arteries following angioplasty without focal intra-luminal stenosis being demonstrated; precluded posterior tibial artery ("PTA"); severely depressed TBI; and no detectable measurable pressure in the DPA. *Id.*

On May 7, 2014, Plaintiff returned to Dr. Klickman for follow up. Tr. at 547. He denied pain in the toe. *Id.* Dr. Klickman indicated Plaintiff's ulcer had healed and that he could discontinue painting it with Betadine. Tr. at 548.

Plaintiff presented to Alfred R. Moss, M.D. ("Dr. Moss"), on June 25, 2014, for nerve conduction velocity ("NCV") and electromyography ("EMG") studies. Tr. at 555. Plaintiff complained of constant bilateral distal lower extremity pain and paresthesias. *Id.* He reported severe burning in his feet that was worse on the left. *Id.* He endorsed bilateral leg cramping and significant pain in his lumbar spine. *Id.* He reported loss of balance and difficulty walking, standing, and sleeping. *Id.* Dr. Moss assessed moderate sensory and motor polyneuropathy of the nerves of the bilateral feet that was axonal in nature. *Id.* He indicated Plaintiff had bilateral lower extremity neuropathy as a result of diabetes. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on June 26, 2014, Plaintiff testified he last worked as a plumber's helper for Compton Plumbing and indicated he was laid off from the job as the result of a

17

lack of work. Tr. at 40–41. He stated he applied for work during the entire period that he collected unemployment, but stopped searching for work in 2011. Tr. at 41–42.

Plaintiff testified he received treatment through a grant-based program called Access Health that relied upon physicians who volunteered their time. Tr. at 45. He indicated he had received treatment for approximately two years. *Id.*

Plaintiff testified that the neuropathy in his feet and legs prevented him from working. Tr. at 46. He indicated that the neuropathy resulted from diabetes that he failed to treat for several years. Tr. at 49. He stated he had received treatment for blocked arteries and a non-healing ulcer on his toe. Tr. at 46. He indicated some of his arteries remained blocked and that he experienced numbness on the bottom of his foot and in his toes. *Id.* He testified he had difficulty with balance. Tr. at 56. He indicated he had bulging discs and pinched nerves in his back. *Id.* He stated he was depressed. Tr. at 47. Plaintiff testified he had difficulty with his bilateral hands and that his doctors initially thought he had carpal tunnel syndrome, but more recently indicated peripheral arterial disease may be affecting his hands. Tr. at 57. He stated his hands often became numb. *Id.* He described some shoulder pain and indicated his doctors thought it may be related to a bulging disc. *Id.*

Plaintiff testified he visited the mental health clinic for treatment, but was informed that they could not provide charity help. Tr. at 47. He indicated he was instructed to go to the emergency room if he thought he was going to hurt himself or someone else. *Id.*

Plaintiff testified that he would prefer to work, but that no one would hire him. Tr. at 48. He stated he had started working as a school bus driver at the age of 16. *Id.* He stated his work history included 20 years with the same company. Tr. at 49.

Plaintiff testified that he did not experience pain while sitting and resting in the hearing room. Tr. at 49. However, he stated that his legs, calves, and feet throbbed when he walked from the parking lot to the hearing office. *Id.* He indicated his legs and feet felt like needles at night and that he could not get comfortable. *Id.* Plaintiff testified he was able to use his hands to pick up small objects, but had some difficulty maintaining a grip on items like a paintbrush and a coffee cup. Tr. at 69.

Plaintiff testified he could stand for 30 to 45 minutes and sit for an hour to an hour-and-a-half at a time. Tr. at 54. He stated he could walk for five to 10 minutes. *Id.* He indicated his doctor told him not to lift over 10 pounds, but that he felt he could lift up to 20 pounds. *Id.* He stated he sometimes used a cane, but indicated it was not prescribed by his doctor. *Id.* Plaintiff testified his doctor had completed an application for him to receive a disabled placard. Tr. at 55.

Plaintiff testified that his doctor prescribed Zoloft for his depression, but that he could not afford an increased dosage of the medication. Tr. at 60. He stated he took Metformin for diabetes and indicated it was effective. Tr. at 61–62. He indicated Gabapentin helped his neuropathy, but that he sometimes could not afford to have it filled because its price had increased from $3 to over $40. Tr. at 62. He stated that both Gabapentin and Prozac made him sleepy. Tr. at 63.

Plaintiff testified that he awoke around 7:00 each morning. Tr. at 58. He stated he watched television, cooked, and assisted his wife with household chores. *Id.* He indicated he was able to shower, dress, and shave on his own. *Id.* He stated he visited the grocery store with his wife. Tr. at 59. He denied visiting family and friends, attending church regularly, and going out to dinner or movies. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") Celena Earl, MRC, CRC, reviewed the record and testified at the hearing. Tr. at 74–80. The VE categorized Plaintiff's PRW as a construction worker I, *Dictionary of Occupational Titles* ("*DOT*") number 869.664-014, with a strength level of heavy and a specific vocational preparation ("SVP") of four. Tr. at 76. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift up to 20 pounds occasionally; could lift or carry up to 10 pounds frequently; could stand or walk for approximately six hours during an eight-hour workday; could sit for approximately six hours during an eight-hour workday; could frequently push and pull with the bilateral upper extremities, reach overhead, stoop, crouch, kneel, and crawl; could occasionally climb ladders, ropes, or scaffolds; must avoid concentrated use of moving machinery and exposure to unprotected heights; and was limited to one- or two-step tasks. *Id.* The VE testified that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. Tr. at 77. The VE identified light jobs with an SVP of two as a small parts assembler, *DOT* number 706.684-022, with 3,700 positions in South Carolina and 87,200 positions in the national

economy; an electronics worker, *DOT* number 726.687-010, with 1,100 positions in South Carolina and 38,900 positions in the national economy; and a laundry folder, *DOT* number 369.687-018, with 1,500 positions in South Carolina and 94,300 positions in the national economy. *Id.*

The ALJ next described a hypothetical individual of Plaintiff's vocational profile who could perform light work as defined in the first hypothetical; could frequently push or pull with the bilateral upper extremities and reach overhead with the right arm; could never climb ladders, ropes, scaffolds, ramps, or stairs; could occasionally balance, stoop, crouch, and kneel; could never crawl; must avoid concentrated use of moving machinery and exposure to unprotected heights; and was limited to one- or two-step tasks. Tr. at 77–78. He asked if there were jobs available for someone with those limitations. Tr. at 78. The VE responded that the individual could perform all the jobs identified in response to the first hypothetical question. *Id.*

The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited as described in the second question, but would be unable to engage in sustained work activity for a full eight-hour workday on a regular and consistent basis because of medical conditions and mental impairments. *Id.* He asked if there would be jobs available. *Id.* The VE indicated there would be no jobs. *Id.*

Plaintiff's attorney asked the VE to assume the same restrictions set forth in the second hypothetical, but to further assume the individual was limited to frequent bilateral handling and fingering. Tr. at 79. He asked if the jobs identified in response to the second question could be performed. *Id.* The VE indicated all the jobs could be performed. *Id.*

Plaintiff's attorney asked the VE to assume the individual could only use his hands in an extended position on a frequent basis. Tr. at 80. He asked if the jobs identified in response to the earlier question would be available. *Id.* The VE indicated that the jobs could be performed. *Id.*

### 2. The ALJ's Findings

In his decision dated October 31, 2014, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirement of the Social Security Act through December 31, 2013.
2.  The claimant has not engaged in substantial gainful activity since June 1, 2011, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  The claimant has the following severe impairments: an affective disorder; an anxiety disorder; diabetes mellitus; diabetic peripheral neuropathy; peripheral artery disease; a right shoulder impingement; cervical degenerative disc disease; and osteoarthritis (20 CFR 404.1520(c) and 416.920(c)).
4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR   404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).
5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift up to 20 pounds occasionally; and lift and carry up to ten pounds frequently. The claimant can stand or walk for six hours and sit for six hours, in an eight-hour workday. The claimant is limited to frequent bilateral pushing/pulling. The claimant can never climb ladders, ropes, scaffolds, ramps, or stairs. The claimant can occasionally balance, stoop, crouch, or kneel, but can never crawl. The claimant is limited to frequent right overhead reaching. The claimant must avoid concentrated use of moving machinery and avoid concentrated exposure to unprotected heights. The claimant is further limited to one or two-step tasks.
6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 25, 1961 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 11–21.

## II. Discussion

Plaintiff alleges the Commissioner erred in improperly rejecting her treating physician's opinion. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A. Legal Framework

#### 1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from engaging in substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

(providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

On March 18, 2013, Dr. Davenport completed two questionnaires. Tr. at 281, 407. The first questionnaire addressed Plaintiff's mental functioning. Tr. at 281. Dr. Davenport indicated Plaintiff had been diagnosed with depression and was prescribed Fluoxetine. *Id.* She stated the Fluoxetine had helped Plaintiff's condition, but that she had referred him to the mental health clinic on January 24, 2013. *Id.* Dr. Davenport described

Plaintiff as being oriented to time, person, place, and situation; having an intact thought process; demonstrating appropriate thought content; having a depressed mood/affect; showing adequate attention/concentration; and demonstrating adequate memory. *Id.* She stated Plaintiff did not exhibit any work-related limitation in function due to the mental condition. *Id.*

The second questionnaire asked if Plaintiff could engage in anything more than sedentary work on an eight-hour day, five day per week basis and defined sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Tr. at 407. Dr. Davenport indicated Plaintiff could perform no more than sedentary work. *Id.* She stated Plaintiff's diagnoses included peripheral neuropathy and probable autonomic neuropathy, syncope, and vascular disease. *Id.* She indicated her opinion was based on Plaintiff's medical records, history, and physical examination. *Id.*

Plaintiff argues the ALJ erroneously rejected the work-preclusive limitations set forth by Dr. Davenport. [ECF No. 13 at 16–22]. He maintains that Dr. Davenport's opinion was particularly important because it suggested he was limited to sedentary work, which directed a finding that he was disabled based on the Medical-Vocational Guidelines. *Id.* at 19. He contends the ALJ failed to identify inconsistencies between Dr. Davenport's examination findings and her opinion. *Id.* at 20. Plaintiff further argues that

the ALJ failed to identify inconsistencies between Dr. Davenport's opinion and the medical evidence as a whole, which supported a finding that Plaintiff was limited to sedentary work. *Id.* at 21–23.

The Commissioner argues the ALJ carefully considered Dr. Davenport's opinion and provided sufficient reasons for the weight he assigned to it. [ECF No. 15 at 11–12]. She maintains Dr. Davenport's opinion was inconsistent with her treatment records and examination findings and with the other evidence of record. *Id.* at 12. She contends Plaintiff's diabetes was controlled; he was able to ambulate independently; he had normal ROM and strength in his upper extremities; he had intact sensation and normal gait; and the wound on his foot was successfully treated. *Id.* She argues Plaintiff's activities of daily living ("ADLs") were consistent with an ability to perform light work. *Id.* at 13. She also maintains the ALJ imposed non-exertional limitations that adequately accommodated all of Plaintiff's limitations. *Id.* at 13–14.

The Social Security Administration's ("SSA's") regulations require that ALJs carefully consider medical source opinions of record. SSR 96-5p. ALJs must accord controlling weight to the opinions of treating physicians that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Should the ALJ determine that the treating physician's opinion is not entitled to controlling weight, the ALJ is required to evaluate the treating physician's opinion and all other medical opinions of record based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Id.*; SSR 96-2p. The relevant factors include (1) the

examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

ALJs are also guided in weighing the relevant factors by the provisions of 20 C.F.R. §§ 404.1527(c) and 416.927(c). A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R.

§ 416.927(d) (2004).[4] Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

This court should not disturb the ALJ's weighing of the medical opinion evidence of record "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam). ALJs are not required to expressly discuss each factor in 20 C.F.R. §§ 404.1527(c) and 416.927(c), but their decisions should demonstrate that they considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). "[C]ourts have consistently held that unexplained and rote observations that an opinion is simply inconsistent with treatment notes or the record, by itself, is not a sufficient basis to reduce the opinion's weight." *Lydia v. Astrue*, No. 2:11-1453-DCN-BHH 2012 WL 3304107, at *10 (D.S.C. July 25, 2012), *adopted by* 2012 WL 3308108 (D.S.C. Aug. 13, 2012), *citing Cagle v. Astrue*, 266 F. App'x 788 (10th Cir. 2008) ("stating 'the ALJ failed to explain or identify what the claimed inconsistencies were between opinion and the other substantial evidence in the record,' and concluded that the ALJ's reasoning was not 'sufficiently

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

specific to enable this court to meaningfully review his findings'"); *Langley v. Barnhart*, 373 F.3d 1116, 1122 (10th Cir. 2004).

The ALJ indicated he accorded "some weight" to Dr. Davenport's March 2013 opinion regarding Plaintiff's mental functioning because it was rendered by Plaintiff's treating physician and was consistent with Dr. Loring's findings. Tr. at 17. He stated he gave "little weight" to Dr. Davenport's opinion that Plaintiff could engage in no more than sedentary work because it was not supported by Dr. Davenport's treatment records and examination findings and was inconsistent with the medical evidence of record. *Id.*

Although the ALJ recognized Dr. Davenport as Plaintiff's treating physician, it does not appear that he accorded her opinion any deference in light of her relationship as required by 20 C.F.R. §§ 404.1527(c) and 416.927(c). The SSA's regulations provide significant deference to treating physicians' opinions, and, while ALJs may give them less weight where the record presents persuasive contrary evidence, it does not appear that the ALJ has cited such evidence. *See Mastro*, 270 F.3d at 178; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Dr. Davenport specifically indicated Plaintiff could engage in no more than sedentary work. Tr. at 407. She did not suggest Plaintiff was incapable of engaging in all work.[5] *See id.*; *see also* Tr. at 281. While the ALJ cited

---

[5] Nevertheless, because of Plaintiff's age, education, and PRW, a finding that he was limited to no more than sedentary work would have directed a finding that he was disabled under Medical-Vocational Rule 201.14. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.14 (directing a finding of "disabled" if an individual is limited to sedentary work; between the ages of 50 and 54; is a high school graduate or more with no education that provides for direct entry into skilled work; and has a history of skilled or semiskilled work without transferable skills). The Medical-Vocational Guidelines consider not just ability to perform work, but also major functional and vocational

evidence to indicate Plaintiff retained some functional abilities, he did not cite evidence that directly contradicted Dr. Davenport's opinion regarding Plaintiff's inability to perform sedentary work. *See* Tr. at 18 (indicating that the record suggested few limitations as a result of Plaintiff's diabetes, which appeared to be controlled as long as Plaintiff was compliant with medications; stating that Plaintiff failed to seek counseling when he was advised to do so and that neither Dr. Loring nor Dr. Davenport indicated he had significant abnormalities or work-related limitations as a result of depression; and finding that Plaintiff's daily activities were inconsistent with an allegation of disability).

In summarizing the medical evidence of record, the ALJ cited evidence that suggested Plaintiff was limited to the extent suggested by Dr. Davenport, as well as evidence that indicated Plaintiff may retain greater functional abilities. *See* Tr. at 15–18 (MRI in August 2012 revealed disc herniation on the right at C6-7; December 2012 exam with Dr. Early indicated right shoulder impingement, 2+ crepitus in knees, indications of difficulty with standing and balancing, intact pulses in feet, and normal x-ray of lumbosacral spine; Plaintiff indicated to Dr. Loring in January 2013 that he was able to drive, perform indoor and outdoor chores, shop, manage money, tend to his personal hygiene, watch television, and prepare simple meals; blood work in January 2013 showed

---

patterns that are encountered in cases where individuals are unable to perform their PRW. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a). Medical-Vocational Rule 201.14 specifically recognizes that individuals over age 50 who have no education that provides for direct entry into skilled work, who cannot return to their PRW, and who have no transferable skills from their PRW to sedentary work would encounter significant practical barriers to obtaining sedentary employment. Thus, it allows for a finding that the individual is disabled, despite the fact that he could perform a sedentary job if given the opportunity.

Plaintiff's A1c level to be 6.0 percent; Plaintiff complained of low back pain and had lower lumbar bilateral tenderness in February 2013; Dr. Davenport signed an application for a disabled placard and license plate application in June 2013; Plaintiff's A1c was 5.5 percent and he was able to ambulate independently and to get on and off an exam table without assistance in June 2013, but a diabetic foot examination showed diminished pedal pulses bilaterally and decreased sensation; Plaintiff complained of leg pain, foot pain, leg cramps, back pain, constant pain, depression, and stiffness in September 2013, but his A1c level was 5.8 percent and he declined recommended treatments; Plaintiff was diagnosed with bilateral lower atherosclerotic disease, mild flow reduction in the right lower extremity, and mild flow reduction in the left upper extremity in October 2013; Plaintiff reported that he had lost consciousness when he ran into a wall while playing with a three-year-old and indicated his foot pain occurred mostly at night in January 2014; Plaintiff presented for treatment of diabetic foot ulcer and cellulitis of the left great toe in March 2014; Plaintiff had normal range of motion and strength in his upper extremity, intact sensation, and a steady gait in March 2014; Dr. Davenport noted that lab work showed reasonable control of Plaintiff's diabetes in April 2014; an April 2014 vascular lower extremities arterial duplex and lower arterial plethysmography procedure indicated elevated velocities in the right mid-SFA, a non-compressible PTA at rest, right TBI reduced at rest, absent color flow and Doppler signal in the left PTA, non-compressible left DPA at rest, reduced TBI at rest, and monophasic Doppler waveforms in Plaintiff's runoff vessels at rest; Plaintiff's ulcer improved and he reported no pain by May 2014; June 2014 NCV testing showed moderate sensory and motor polyneuropathy

that was axonal in nature in the nerves of the bilateral feet and Plaintiff was diagnosed with bilateral lower extremity neuropathy).

The ALJ failed to reconcile the evidence to allow the court to determine why he concluded Dr. Davenport's opinion was unsupported by her treatment records and inconsistent with the other medical evidence of record. Based on the ALJ's summary, he could have just as easily concluded that Plaintiff was limited to sedentary work instead of light work based on the objective testing that showed a disc herniation in Plaintiff's cervical spine, significant peripheral arterial disease, and moderate diabetic neuropathy; examination reports that indicated decreased sensation and diminished pedal pulses; a history of poorly-healing foot ulcer, cellulitis, and angioplasty; and Plaintiff's multiple complaints of foot pain, cramps, tingling, shoulder pain, claudication, and difficulty ambulating. *See* Tr. at 15–18. While the Commissioner points to the evidence cited by the ALJ that supports his RFC finding and decision to reject Dr. Davenport's opinion, she ignores the other evidence the ALJ also cited that was consistent with Dr. Davenport's opinion. *Compare* ECF No. 15 at 12–13, *with* Tr. at 15–18. The court's review is limited to the ALJ's decision, which lacks explanation as to how the evidence cited either supports or refutes Dr. Davenport's opinion. *See Hall v. Colvin*, No. 8:13-2509-BHH-JDA, 2015 WL 366930, at *11 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. March 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Thus, it is impossible to determine based on a

review of the ALJ's decision why he concluded that Dr. Davenport's opinion was entitled to little weight.

In light of the foregoing, the undersigned recommends the court find the ALJ erred in failing to adequately consider Dr. Davenport's opinion in light of the requirements of 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) and in neglecting to explain his conclusion that Dr. Davenport's opinion was unsupported by her findings and the other medical evidence of record.

## III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

Shiva V. Hodges

January 26, 2016                                    Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).